1  Jun Dam (*Pro Se*)
2  5432 Geary Blvd #535
   San Francisco, CA 94121
3  Phone: (415) 748-1113
   Email: jundam@hotmail.com
   Pro Se Litigant
4

FILED IN THE U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

DEC 1 3 2024

SEAN F. McAVOY, CLERK
SPOKANE, WASHINGTON

5              **UNITED STATES DISTRICT COURT**
               **EASTERN DISTRICT OF WASHINGTON**
6

7  **Jun Dam,**                          Case No. **2:24-cv-00417-SAB**
              Plaintiff,
8                                         **COMPLAINT FOR**
   v.                                     **UNJUST ENRICHMENT,**
9                                         **CONSTRUCTIVE TRUST,**
                                          **AND FRAUD ON THE**
   **Mark D. Waldron,**                   **COURT**
10 **Chapter 7 Trustee;**

11 **Pamela M. Egan,**
   **Attorney to Ch. 7 Trustee;**
12                                        **JURY TRIAL DEMANDED**
   **Potomac Law Group, PLLC;**
13
   **Giga Watt Bankruptcy Estate,**
14
              Defendants.
15

16 **1. Introduction**

17 This action is brought by **Jun Dam** ("Plaintiff"), proceeding pro se, against the

18 **Giga Watt Bankruptcy Estate, Trustee Mark D. Waldron, Pamela M. Egan,**

19 **Potomac Law Group, PLLC** (collectively, "Defendants") for **unjust enrichment,**

**the imposition of a constructive trust, and fraud on the court.** The claims arise from the wrongful diversion and retention of $3 million intended for the Plaintiff under a settlement agreement with Perkins Coie LLP. These funds, which were wrongfully allocated to the bankruptcy estate, belong to the Plaintiff as token holders in a separate class-action settlement agreement, independent of the bankruptcy estate.

The Defendants' retention of these funds was based on misrepresentations made by Trustee Waldron and his counsel Egan, which led to the bankruptcy court's erroneous ruling in favor of the estate. The Trustee and counsel Egan's fraudulent conduct and misapplication of the automatic stay resulted in an unjust allocation of the funds, causing direct harm to the Plaintiff. The Plaintiff seeks declaratory relief, the imposition of a constructive trust on the wrongfully retained funds, and other equitable remedies as deemed appropriate.

**<u>Jurisdiction</u>**

This Court has jurisdiction over this matter under **28 U.S.C. § 1334(b)**, as it arises out of and is related to the Giga Watt bankruptcy proceedings. However, the Plaintiff's claims are **non-core bankruptcy matters,** as they involve independent state-law claims for unjust enrichment, constructive trust, and fraud on the court. These claims exist independently of the bankruptcy estate's administration, making

them subject to Article III jurisdiction.

The Plaintiff asserts that these claims are based on state law, distinct from the federal bankruptcy code, and must be adjudicated in a U.S. District Court pursuant to *Stern v. Marshall*, 564 U.S. 462, 131 S. Ct. 2594, 180 L. Ed. 2d 475 (2011). In *Stern*, the Supreme Court held that certain state-law claims, even if related to bankruptcy, cannot be adjudicated by a bankruptcy court because they involve private rights and require resolution in an Article III court. Here, the Plaintiff's state-law claims exist outside of the bankruptcy estate's administration, requiring an Article III court to issue a final judgment.

Moreover, the Plaintiff explicitly **does not consent** to the bankruptcy court's jurisdiction over these claims, invoking the protection granted under *Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 135 S. Ct. 1932, 191 L. Ed. 2d 911, 83 U.S.L.W. 4337 (2015). Consent is a necessary precondition for a bankruptcy court to adjudicate non-core matters, and the Plaintiff unequivocally withholds such consent.

**Supplemental Jurisdictional Arguments**

The Plaintiff asserts that it, not the bankruptcy estate, had the proper standing to pursue the original claims related to the escrow funds. The **$3 million settlement** between the bankruptcy estate and Perkins Coie addressed the premature release of

money held in escrow by Perkins Coie LLP, which was intended to benefit the **token holders**, not the bankruptcy estate. The estate lacked **privity** with the Plaintiff or the escrow agreement. This is not a derivative claim belonging to the estate but rather a **direct claim of the Plaintiff**, who suffered harm from the wrongful allocation of these funds. The estate cannot assert standing over the escrow funds or the settlement proceeds because:

- **No Privity:** The bankruptcy estate was not a party to the escrow agreement between Perkins Coie and the token holders.

- **No Harm:** The estate did not suffer harm from the premature release of funds and was unjustly enriched by the $3 million settlement.

In *Ahcom, Ltd. v. Smeding*, 623 F.3d 1248 (9th Cir. 2010), the court held that a bankruptcy estate **cannot assert standing** over a claim belonging to a creditor or third party when **privity** is lacking. Similarly, in this case, the **Plaintiff held an independent right** to the settlement funds that were improperly diverted to the bankruptcy estate.

The **misallocation of the settlement funds** deprived the token holders of their rightful compensation and resulted in the estate receiving funds to which it had no legal claim. Accordingly, the Plaintiff maintains that these funds were improperly retained by the estate, and any attempt to assert standing by the Trustee or estate

must fail due to the lack of privity and harm.

**Fraud on the Court**

The Trustee and Egan engaged in fraudulent conduct by making material misrepresentations to the bankruptcy court regarding the ownership and rights to the $3 million. Specifically, the Trustee and counsel Egan falsely claimed that the funds were part of the bankruptcy estate's claims against Perkins Coie, leading the court to erroneously approve the allocation. These misrepresentations, coupled with selective disclosure of critical facts, corrupted the integrity of the judicial process by presenting a misleading narrative that deprived the Plaintiff of its rightful recovery.

Fraud on the court occurs when conduct undermines the integrity of the judicial process itself, rather than simply affecting the outcome of a case. As articulated in *Bulloch v. United States*, 763 F.2d 1115 (10th Cir. 1985), fraud on the court requires "an unconscionable plan or scheme" that is designed to improperly influence the court's decision-making process. The court in *Bulloch* emphasized that such fraud occurs when an officer of the court, such as a trustee, engages in deliberate misconduct that affects the impartiality of the court and undermines public confidence in the judicial system.

While the *Bulloch* court ultimately denied relief in that particular case, the

principles it outlined regarding the severity and scope of fraud on the court support the Plaintiff's position. The Trustee and Egan's actions here rise to the threshold of fraud on the court as defined in *Bulloch*, involving intentional deception that compromised the fairness and impartiality of the bankruptcy proceedings. Unlike *Bulloch*, where the court found no direct impact on the judicial process, the Trustee and Egan's actions in this case directly manipulated the court into improperly approving the allocation of funds that were not part of the bankruptcy estate. The Plaintiff asserts that the Trustee and Egan's misrepresentations constitute fraud on the court because they:

- Deceived the bankruptcy court into believing that the funds were estate property, when they were not.

- Prevented the court from fairly adjudicating the rightful ownership of the funds.

- Resulted in an unjust outcome that deprived the Plaintiff of funds intended for its benefit.

Fraud on the court, as described in *Bulloch*, necessitates immediate redress to restore the integrity of the judicial process and prevent further harm. The Plaintiff respectfully requests that this Court take corrective action by vacating the improper allocation, ordering restitution of the misallocated funds, and granting appropriate

equitable relief to ensure justice is served.

**Automatic Stay Misapplication**

The bankruptcy court erred in **applying the automatic stay** to **Counts I-III** of the Plaintiff's class-action claims. (See **Exhibit F (Appendix A, p. 158)** of the Declaration of Jun Dam)  The Plaintiff's claims regarding the escrow are **independent state-law claims** that predate the bankruptcy and are **not derivative of the bankruptcy estate's claims**. These claims arise from the wrongful release and misallocation of escrow funds and are **unrelated to the administration of the estate** or the debtor's obligations in bankruptcy.

The **automatic stay** under **11 U.S.C. § 362** should not have extended to these claims because:

- **Independent Rights**: The escrow claims are based on the Plaintiff's state-law rights, which are separate from the bankruptcy estate.

- **Non-Estate Claims**: The claims are not property of the estate nor subject to the debtor-creditor relationship being restructured in bankruptcy.

- **Pre-Bankruptcy Conduct**: The wrongful release of escrow funds and the resulting harm occurred prior to the bankruptcy filing

By **misapplying the automatic stay**, the bankruptcy court **enabled the bankruptcy estate to wrongfully obtain settlement funds** through an **incorrect**

1   **ruling** that improperly assigned **three of five claims** to the estate. This

2   **misallocation** distorted the distribution of funds and deprived the Plaintiff of its

3   rightful recovery.  **Correction by this Court is necessary** to prevent further unjust

4   enrichment and ensure that the escrow funds are properly allocated to the Plaintiff.

5   As a result of this erroneous ruling, Perkins Coie paid $3 million of the $7.5

6   million escrow liability to the bankruptcy estate, instead of the full $7.5 million to

7   the token-holder class-action group as intended. The automatic stay should not

8   have applied to the class-action lawsuit, as the claims under the escrow agreement

9   were not part of the estate's interests. By applying the stay, the bankruptcy court

10  improperly allowed the estate to divert funds that rightfully belonged to the token

11  holders. Courts have consistently ruled that claims based on independent state-law

12  rights, such as those arising under this escrow agreement, should not be subject to

13  an automatic stay merely because a bankruptcy is involved.

14  **Venue**

15  Venue is proper in this District pursuant to **28 U.S.C. § 1391**, as the wrongful

16  actions and misallocation of funds took place within this District. Additionally, this

17  Court's oversight is necessary to ensure a fair and impartial adjudication. The

18  bankruptcy court has demonstrated bias in favor of the Trustee and has failed to

19  provide a neutral forum for the Plaintiff's claims. Given the serious allegations of

fraud on the court and the misapplication of the automatic stay, the U.S. District Court is the appropriate venue to rectify these errors and ensure that justice is served.

The District Court, as an Article III court, is best positioned to adjudicate these non-core state-law claims impartially and in accordance with constitutional principles. The impartiality of this Court is critical to ensuring a fair outcome for the Plaintiff, who has been subjected to wrongful actions and procedural missteps in the bankruptcy court.

**Explanation of Pro Se Filing and Future Class Action**

The Plaintiff respectfully informs the Court that this action is being filed individually and pro se due to the urgency of preserving rights related to the misallocated $3 million settlement funds. The Plaintiff has been unable to retain legal counsel to represent a reconstituted class action at this time.

However, it is the Plaintiff's intention to secure counsel and reconstitute the token holder class action in the near future. This individual pro se filing is necessary to prevent further harm and ensure the Court's timely review of critical issues related to the unjust enrichment and misallocation of escrow funds. The Plaintiff requests that this explanation be considered in the interest of justice and to preserve the claims of all affected token holders.

By filing this action individually, the Plaintiff seeks to address the immediate inequities while maintaining the ability to transition this matter into a broader class-action framework with appropriate legal representation. The Plaintiff appreciates the Court's understanding and consideration in this matter.

**Parties**

**Plaintiff**

- **Jun Dam**: Plaintiff, a pro se litigant, was the initial lead plaintiff in a class-action lawsuit against Perkins Coie LLP on behalf of token holders and is also a creditor of the Giga Watt bankruptcy estate. Plaintiff owns approximately 1 million of the approximately 20 million tokens issued during the Giga Watt token sale.

**Defendants**

- **Mark D. Waldron, Chapter 7 Trustee**: Defendant Waldron is the Trustee of the Giga Watt bankruptcy estate. As the fiduciary responsible for managing the estate, Waldron had a legal duty to act in the best interests of creditors and to ensure compliance with bankruptcy law.

- **Pamela M. Egan, Attorney for Trustee**: Defendant Egan is an attorney licensed to practice law in Washington, employed by Potomac Law, PLLC. Egan acted as legal counsel for Defendant Waldron in the Giga Watt bankruptcy

proceedings and played a central role in the alleged fraud on the court. Her material misrepresentations, omissions, and misuse of procedural tools led to the improper allocation of $3 million in escrow funds to the bankruptcy estate.

- **Potomac Law, PLLC**: Defendant Potomac Law, PLLC, is a professional limited liability company headquartered in Washington, D.C. The firm is vicariously liable for the actions of its attorney, Defendant Egan, who acted within the scope of her employment while representing Defendant Waldron and the bankruptcy estate. Potomac Law, PLLC, benefited financially from the contingency fee arrangement tied to the $3 million settlement allocation.

- **Giga Watt Bankruptcy Estate**: The Giga Watt bankruptcy estate is a legal entity created under 11 U.S.C. § 541 and is managed by Defendant Waldron. The estate improperly received $3 million in settlement funds that rightfully belonged to token holders.

---

## 2. Factual Background

**2017 Giga Watt Inc. Token Sale:**

In 2017, Giga Watt Inc. conducted a token sale, offering investors tokens that represented 50-year lease rights to facilities intended for cryptocurrency mining. These facilities were designed to provide infrastructure for token holders to mine

cryptocurrencies for the duration of the lease term. To protect the interests of the token holders, Giga Watt entered into an escrow agreement with Perkins Coie LLP.

**Escrow Agreement with Perkins Coie:**

Under the terms of the escrow agreement, funds raised during the token sale were to be held in escrow by Perkins Coie. The funds were to be released only after Giga Watt successfully completed the construction and operational setup of the cryptocurrency mining facilities. This arrangement was intended to ensure that token holders would not be financially exposed until the facilities were fully operational and ready for use.

**Escrow Mismanagement:**

Despite Giga Watt's failure to complete the necessary facilities, Perkins Coie prematurely released approximately $11 million from the escrow account. This release violated the terms of the escrow agreement, as the facilities were incomplete and non-functional, leaving token holders without the infrastructure they had been promised. This mismanagement resulted in significant financial losses to the token holders, as Giga Watt did not fulfill its obligations under the token sale.

**Giga Watt Bankruptcy (Chapter 11 & Chapter 7)**

In 2018, Giga Watt filed for **Chapter 11 reorganization**, but later converted to

**Chapter 7 liquidation** due to its **inability to complete its projects** and operational inefficiencies. These failures prevented the company from delivering the promised cryptocurrency mining facilities to token holders, leaving them without the infrastructure they had purchased.

The **bankruptcy estate further hindered the token holders' efforts** to recover their losses from Perkins Coie's escrow mismanagement by **issuing an automatic stay** that paused the class-action lawsuit against Perkins Coie. (See **Exhibit A (Appendix A, p. 6) and Exhibit F (Appendix A, p. 158)** of the Declaration of Jun Dam) This legal maneuver delayed the token holders' ability to seek rightful compensation, complicating their efforts to address the premature release of escrowed funds.

**Two Settlement Agreements:**

- **$4.5 Million Settlement (Token Holders' Class Action Group):**

In response to Perkins Coie's premature release of funds, the token holders' class action group reached a settlement with Perkins Coie for $4.5 million. (See **Exhibit B (Appendix A, p. 26) and Exhibit C (Appendix A, p. 64)** of the Declaration of Jun Dam) This settlement was intended to compensate the token holders for the losses incurred due to the release of escrowed funds without the completion of Giga Watt's facilities.

1  - **$3 Million Settlement (Bankruptcy Estate and Trustee):**

2  Separately, the Giga Watt bankruptcy estate, represented by the Trustee, entered

3  into a $3 million settlement with Perkins Coie. (See **Exhibit D (Appendix A, pg.**

4  **71)** of the Declaration of Jun Dam) While Perkins Coie acted as the escrow

5  custodian, the token holders were the intended beneficiaries of the escrow. The

6  Giga Watt estate, though positioned as a counterparty to the token holders, was not

7  a direct party to the escrow agreement and had no standing to claim harm from the

8  premature release of funds.

9  Rather than suffering harm, **the estate unjustly benefited twice**: first, as the Giga

10  Watt debtor receiving approximately $11 million from the escrow that should not

11  have been released; and later, as the bankruptcy estate receiving $3 million in

12  settlement funds that rightfully belonged to the token holders. The estate's receipt

13  of these funds constitutes unjust enrichment, as it neither suffered financial harm

14  nor provided any consideration related to the escrow. Under the terms of the

15  escrow agreement, the funds were intended for the token holders, making the

16  estate's claim to them both illegitimate and inequitable.

17  This $3 million settlement, secured through misrepresentations and unsupported

18  claims of standing, deprived the token holders of the compensation they were

19  entitled to under the escrow agreement and improperly enriched the bankruptcy

estate at their expense.

**Bankruptcy Court Ruling**:

In an erroneous ruling during automatic stay proceedings, the bankruptcy court determined that three out of five of the token holders' breach of contract claims—stemming from the escrow mismanagement—belonged to the bankruptcy estate. This ruling was flawed, as the token holders were the direct beneficiaries of the escrow agreement, and the bankruptcy estate suffered no direct harm. The court's decision effectively diverted funds from the token holders to the bankruptcy estate, despite the estate having no standing in the escrow agreement.

**Release Language Challenges**:

The $4.5 million settlement agreement between the token holders and Perkins Coie included a release of claims against the bankruptcy estate. However, this release is unenforceable due to a lack of privity between the token holders and the bankruptcy estate, lack of consideration, and the absence of authority for the estate to enforce the release as a third-party beneficiary. Consequently, the release language does not bar the token holders from pursuing their rightful claims against the bankruptcy estate for unjust enrichment and misallocation of funds.

---

**3. Causes of Action**

## A. Count I: Unjust Enrichment

**Legal Elements:**

**Defendant's Enrichment:** The defendant received a benefit at the expense of the plaintiff.

**Injustice of Retention:** Retaining this benefit is unjust without compensating the plaintiff.

**Facts Supporting Unjust Enrichment:**

**Escrow Agreement & Token Sale:**

In 2017, token holders participated in Giga Watt's token sale, purchasing tokens that represented 50-year lease rights to cryptocurrency mining facilities. These token sales generated approximately $22 million, which was placed in escrow with Perkins Coie as the escrow custodian. Under the escrow agreement, the funds were to be released only after Giga Watt completed the necessary facilities, protecting the financial interests of the token holders.

**Premature Release & Misallocation of Funds:**

Despite Giga Watt's failure to complete the promised facilities, Perkins Coie prematurely released approximately $11 million from the escrow, benefitting Giga Watt Inc. The token holders, as a class-action group, pursued legal claims against Perkins Coie for the improper release. However, the bankruptcy estate filed for an

automatic stay to block the class-action proceedings. During the automatic stay proceedings, the bankruptcy court incorrectly ruled that **three out of five causes of action** belonged to the bankruptcy estate, rather than the token holders. As a result of this misallocation of claims, the estate wrongfully obtained a **$3 million settlement** from Perkins Coie. (See **Exhibit D (Appendix A, p. 71)** of the Declaration of Jun Dam)  The bankruptcy estate, however, was not a **direct party beneficiary of the escrow agreement**, had no standing under the agreement, and suffered no harm from the premature release of the funds. This incorrect allocation constitutes **unjust enrichment**, as it deprived the token holders—who were the intended beneficiaries—of their rightful recovery.

**Lack of Standing:**

The bankruptcy estate lacked **standing** to assert any claim over the escrow funds, as the **token holders**—not the estate—were the parties harmed by the premature release of those funds. Despite this, **$3 million** was improperly diverted to the estate through its settlement with **Perkins Coie**. This misallocation directly reduced the amount available to the token holders in their class-action settlement, leaving them with only **$4.5 million** out of the **$7.5 million** (or more) they were entitled to receive.

**Harm to the Token Holders:**

The **misallocation of funds** caused substantial financial harm to the token holders by depriving them of a larger recovery. The token holders expected to receive **at least $7.5 million** from the settlement. However, due to the **bankruptcy estate's improper claim** to the escrow funds, they ultimately received only **$4.5 million**.

**Legal Precedent:**

*Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753 (9th Cir. 2015):

In *Astiana*, the court clarified that while unjust enrichment is not a standalone cause of action under California law, it can be construed as a valid quasi-contract claim seeking restitution. The court emphasized that unjust enrichment occurs when one party retains a benefit to which it has no legal or contractual claim. Similarly, the bankruptcy estate's retention of $3 million, which rightfully belonged to the token holders under the terms of the escrow agreement, constitutes unjust enrichment. This retention was inequitable and unauthorized, aligning with the principles outlined in *Astiana*. The token holders' claim for restitution reflects a quasi-contractual obligation to prevent the estate from being unjustly enriched at their expense.

*Ahcom, Ltd. v. Smeding*, 623 F.3d 1248 (9th Cir. 2010)

*Ahcom* reinforces that a bankruptcy estate cannot claim funds where it lacks privity or contractual relationship. In this case, the escrow agreement named the token

holders as beneficiaries, leaving the bankruptcy estate without standing to claim or retain the funds.

**Injustice of the Enrichment:**

The retention of $3 million by the bankruptcy estate is unjust for several reasons:

1. **Deprivation of Contractual Rights:**

The **escrow agreement** was established to protect the token holders' financial interests. The estate's wrongful retention deprived the token holders of their rightful recovery.

2. **Lack of Harm to the Estate:**

The bankruptcy estate did not suffer any harm or loss from the premature release of escrowed funds. On the contrary, Giga Watt, the debtor, and the bankruptcy estate benefited by receiving approximately $11 million from the premature release. Retaining the $3 million settlement, for which the estate had no legal or equitable claim, constitutes unjust enrichment and is fundamentally inequitable.

3. **Misallocation Based on Trustee's Misrepresentation:**

The **Trustee and Egan misrepresented the estate's standing** to the bankruptcy court, leading to the improper allocation of claims. This misrepresentation resulted in the estate wrongfully benefiting from the $3 million settlement, which should have been allocated to the token holders.

**Relief Sought:**

The plaintiff respectfully requests that the court grant the following relief:

- **Disgorgement of Funds:**

  The bankruptcy estate must disgorge the $3 million settlement funds and return them to the token holders, who are the rightful beneficiaries under the escrow agreement.

- **Constructive Trust:**

  A **constructive trust** should be imposed over the $3 million, ensuring that the funds are held for the benefit of the token holders and not used to satisfy other claims of the bankruptcy estate.

- **Interest:**

  The plaintiff seeks **interest** on the $3 million from the date the funds were misallocated, compensating for the delay in recovery.

- **Additional Damages:**

  If the court finds that the **estate acted in bad faith** or engaged in egregious misconduct, the plaintiff seeks **punitive damages** to deter such behavior and remedy the harm caused to the token holders.

**Unjust Enrichment Conclusion:**

The bankruptcy estate's retention of $3 million constitutes **unjust enrichment**. The funds were intended for the token holders, who suffered direct harm due to the premature release and misallocation of the escrowed funds. The estate had no legal standing to claim these funds and did not suffer any loss. **Equity demands** that the court order the disgorgement of the $3 million to the token holders and impose a constructive trust to prevent further unjust enrichment.

---

**B. Count II: Constructive Trust**

**Elements of the Claim:**

- **Ownership in Equity:** The defendant holds money or property that, in equity and good conscience, belongs to the plaintiff.

- **Wrongful Conduct or Unjust Enrichment:** The defendant's wrongful conduct or unjust enrichment warrants the imposition of a trust over specific, identifiable assets.

**Facts Supporting the Constructive Trust:**

**Escrow Agreement and Intended Beneficiaries:**

The **$3 million settlement funds** received by the bankruptcy estate resulted from the **premature release of escrowed funds** by Perkins Coie LLP, in violation of the terms of the **2017 escrow agreement**. The agreement was designed to **protect the**

1    **token holders** by ensuring that the funds remained in escrow until Giga Watt

2    completed the promised facilities. Under this agreement, the **token holders** were

3    the **intended beneficiaries**, not the bankruptcy estate. Despite these protections,

4    **Perkins Coie released $11 million prematurely** to benefit **Giga Watt Inc. and its**

5    **partners**, breaching the agreement. As part of a subsequent settlement to address

6    this violation, **Perkins Coie allocated $3 million to the bankruptcy estate**, even

7    though the estate had **no legal or equitable standing** to receive the funds. **This**

8    **diversion deprived the token holders of a greater recovery**, exacerbating the

9    financial harm caused by the premature release.

10    **Wrongful Allocation of Settlement Money to the Estate:**

11    The bankruptcy estate improperly received **$3 million** from the settlement due to a

12    **misapplication of the automatic stay proceedings**, during which the bankruptcy

13    court incorrectly ruled that **three out of five class-action claims** belonged to the

14    estate rather than the **token holders**. This ruling resulted in the estate being

15    **unjustly enriched** by receiving funds intended to compensate the token holders for

16    the **harm caused by the premature release** of escrow funds. The bankruptcy

17    estate was neither a **direct beneficiary of the escrow agreement** nor had any **legal**

18    **claim** under its terms. Moreover, the estate suffered **no harm** from the release of

19    the funds. As the **rightful claimants**, the token holders were deprived of the full

value of their settlement, receiving only **$4.5 million** out of the **$7.5 million** that Perkins Coie had set aside to resolve the escrow dispute.

**Specific Identifiable Asset: The Settlement Funds**

The $3 million settlement funds represent a specific, traceable, and identifiable asset, as these funds directly resulted from the premature release of escrowed money by Perkins Coie. These funds were transferred as part of the settlement agreement resolving claims related to the escrow mismanagement and were intended for the token holders.

The settlement money remains distinct and identifiable because it arose from the class-action claims addressing the escrow mismanagement, making it a proper subject for a constructive trust. Courts consistently impose constructive trusts over identifiable assets, particularly when they are traceable to specific transactions where the rightful owners were deprived of their benefits.

While the exact status of these funds within the estate's accounts is currently unknown, their traceability as a distinct and identifiable asset remains clear. The $3 million can be traced directly from Perkins Coie to the bankruptcy estate. This traceability satisfies the requirement for imposing a constructive trust over specific assets. The Plaintiff respectfully requests an accounting to confirm the location and status of these funds within the estate's financial holdings to ensure that their

traceable and identifiable nature is preserved.

**Legal Basis for Constructive Trust:**

**Equitable Relief to Prevent Unjust Enrichment:**

The **bankruptcy estate's receipt of the $3 million** constitutes **unjust enrichment**, as it benefitted from the **wrongful allocation** of the settlement funds at the **expense of the token holders**. Without the imposition of a constructive trust, the estate will retain the funds despite having **no standing** or **right to the escrow money**. Equity demands that the **settlement funds** be held in a constructive trust to ensure they are returned to their intended purpose: compensating the token holders for the losses caused by the premature release of escrow funds.

**Applicable Legal Precedent:**

***Simonds v. Simonds***, **45 N.Y.2d 233, 408 N.Y.S.2d 359, 380 N.E.2d 189 (N.Y. 1978):** In *Simonds*, the court held that a constructive trust is appropriate when one party holds assets that, in equity, belong to another. Here, the bankruptcy estate retains **$3 million in settlement funds**, which rightfully belong to the **token holders**, warranting the imposition of a constructive trust.

***Harris Tr. & Sav. Bank v. Salomon Smith Barney Inc.***, **530 U.S. 238, 120 S. Ct. 2180 (2000):** This case supports the principle that wrongful possession of identifiable funds justifies the imposition of a constructive trust. The **estate's**

1  **retention of settlement funds intended for the token holders** mirrors **the**

2  circumstances addressed in **Harris Trust**, making a constructive trust the proper

3  remedy.

4  *Torres v. Eastlick*, **767 F.2d 1573 (9th Cir. 1985):**

5  Finding no fraud and observing that "we cannot accept the proposition that the

6  bankruptcy estate is automatically deprived of any funds that state law might find

7  subject to a constructive trust"

8  ***Seventh Elect Church v. First Seattle Dexter Horton National Bank*, 162 Wn.**

9  **437, 299 P. 359, 162 Wash. 437 (Wash. 1931):**

10  "Where, for any reason, the legal title to property is placed in one person under

11  such circumstances as to make it inequitable for him to enjoy the beneficial

12  interest, a trust will be implied in favor of the persons entitled thereto. This arises

13  by construction of equity, independently of the intention of the parties. Equity will

14  raise a constructive trust and compel restoration, where one through actual fraud,

15  abuse of confidence reposed and accepted, or through other questionable means,

16  gains something for himself which, in equity and good conscience, he should not

17  be permitted to hold."

18  *Baker v. Leonard*, **120 Wn. 2d 538, 120 Wash. 2d 538, 843 P.2d 1050 (Wash.**

19  **1993):** "Unless an equitable base is established by evidence of intent, there must

be "some element of wrongdoing" in order to impose a constructive trust. (See, e.g., *Peste v. Peste*, 1 Wn. App. 19, 23, 459 P.2d 70 (1969); *Huber v. Coast Inv. Co.*, 30 Wn. App. 804, 810, 638 P.2d 609 (1981)). Wrongdoing, however, is not confined to a particular category, such as fraud, misrepresentation, or bad faith, although one of these usually forms the basis for imposition of a constructive trust." (See also *Scymanski v. Dufault*, 80 Wn. 2d 77, 80 Wash. 2d 77, 491 P.2d 1050 (Wash. 1971))

***Viewcrest Cooperative Assoc. v. Deer*, 70 Wn. 2d 290, 70 Wash. 2d 290, 422 P.2d 832 (Wash. 1967):**  The court's ruling that a constructive trust can be imposed when a fiduciary misappropriates property and transfers it to a third party is directly applicable. In this case, Perkins Coie (as a fiduciary) misappropriated escrow settlement funds and transferred them to the bankruptcy estate.

**Relief Sought:**

- **Imposition of a Constructive Trust:**

The plaintiff respectfully requests that the court **impose a constructive trust** over the **$3 million settlement funds currently held by the bankruptcy estate**. This trust will ensure that the funds are preserved and distributed for the **benefit of the token holders**, who were the intended beneficiaries under the escrow agreement.

- **Restitution of Funds:**

The plaintiff requests that the **bankruptcy estate disgorge the $3 million settlement funds** and transfer them to the constructive trust for distribution to the token holders, remedying the **financial harm** caused by the wrongful retention.

- **Interest and Additional Equitable Relief:**

The plaintiff seeks **interest on the $3 million** from the time of the wrongful allocation until the funds are returned to the constructive trust. Additionally, the plaintiff requests any further **equitable relief** necessary to compensate the token holders fully and correct the **unjust enrichment**.

**Constructive Trust Conclusion:**

The **$3 million settlement** received by the bankruptcy estate was the result of **misallocated class-action claims** and **errors in the automatic stay proceedings**, causing unjust enrichment at the expense of the **token holders**. The **token holders were the rightful beneficiaries** of the escrow agreement and suffered financial harm due to the **mismanagement and premature release** of the escrow funds. A **constructive trust is necessary** to restore the funds to their rightful owners and prevent the bankruptcy estate from **benefitting unjustly**. The court should grant the requested relief by imposing a constructive trust, ordering the **return of the $3**

1  **million**, and providing additional equitable remedies to protect the **token holders'**

2  **rights**.

3  ───────────────────────────────────────────

4  **C. Count III: Fraud on the Court**

5  **Legal Framework**

6  Fraud on the court occurs when an officer of the court, such as a trustee, engages in

7  **intentional misconduct** by misrepresenting material facts or using improper legal

8  tactics to manipulate the judicial process. The misconduct must exceed mere

9  negligence or poor judgment, involving a **deliberate intent to deceive** the court

10  and undermine the integrity of the proceedings. The doctrine of fraud on the court

11  applies when the deception directly affects the judicial process, resulting in an

12  **unjust outcome** that harms an opposing party or unfairly benefits the wrongdoer.

13  **Key Legal Precedents**

14  In *Hazel-Atlas Co. v. Hartford Co.*, 322 U.S. 238, 64 S. Ct. 997 (1944), the U.S.

15  Supreme Court set the standard for fraud on the court, holding that fraud that

16  corrupts the judicial process justifies vacating prior orders. Similarly, in *Bullock v.*

17  *United States*, 265 F.2d 683 (6th Cir. 1959), the court explained that fraud on the

18  court must involve conduct that prevents the judicial system from functioning

19  impartially. The misconduct here meets these standards, as the Trustee and Egan's

deliberate misrepresentations to the bankruptcy court fundamentally distorted the proceedings and misallocated settlement funds.

**Elements of the Claim:**

   **1. Misrepresentation of material facts**

   **2. Intent to deceive the court to secure an unjust legal outcome**

   **3. Impact on judicial decisions, resulting in harm to an opposing party or wrongful benefit to the wrongdoer**

**Facts Supporting Fraud on the Court**

   1. **Misrepresentation of Standing**

The Trustee and his counsel Egan falsely asserted that the bankruptcy estate had standing to claim damages from the premature release of escrow funds held by Perkins Coie LLP. However, the **escrow was created for the benefit of the token holders,** not the estate. Despite occasionally acknowledging that the token holders were the intended beneficiaries, the Trustee and Egan deliberately advanced claims on behalf of the estate.  The Trustee's initial admission that the estate lacked standing to assert these claims is documented in **Exhibit E (Appendix A, pp. 115–117)** of the Declaration of Jun Dam.

   a. **Impact:** The Trustee and Egan's misrepresentation allowed the estate to obtain a **$3 million settlement,** diverting funds that should have gone to the

token holders. This deception deprived the token holders of their ability to pursue independent claims and recover their rightful share of the escrowed funds.

### 2. Misrepresentation of Harm to the Estate

The Trustee and Egan misled the court by portraying the estate as having suffered harm from the premature release of escrow funds. In reality, the **estate benefited from the release** and suffered no loss or injury. Despite this, the Trustee and Egan used this misrepresentation to secure funds under the guise of compensating the estate.

   a. **Impact:** These false claims persuaded the court to enjoin the token holders' class-action lawsuit, blocking their ability to pursue their rightful share of the escrowed funds. The misrepresentation of harm also formed the basis for the estate's wrongful acquisition of claims.

### 3. Improper Allocation of Claims to the Estate

During the automatic stay proceedings, the Trustee and Egan misrepresented the nature of the token holders' claims, leading the bankruptcy court to incorrectly rule that **three out of five claims** belonged to the estate. These claims were independent causes of action belonging to the token holders, **not derivative claims** tied to the bankruptcy estate.

a.   **Impact:** This misallocation enabled the estate to **retain $3 million**, causing financial harm to the token holders by reducing their recovery from **$7.5 million to $4.5 million**.

4. **Selective Presentation of Facts**

The Trustee and Egan concealed critical facts, such as the **estate's lack of standing** and that the token holders were the rightful beneficiaries of the escrow. Additionally, the Trustee and Egan failed to disclose that the estate had already received funds without suffering any harm, misleading the court into approving the wrongful settlement.

a.   **Impact:** The selective disclosure of information created a distorted narrative, influencing the court's rulings in favor of the estate and resulting in an unjust allocation of the escrow funds.

5. **Abuse of Legal Procedures to Suppress Token Holders' Claims**

The Trustee used the **automatic stay** and motions for **sanctions** to block the token holders' class-action lawsuit, preventing them from pursuing valid claims. These procedural tools were employed to suppress discovery efforts and stifle the token holders' ability to recover funds.

a.   **Impact:** The misuse of the automatic stay prevented the court from uncovering the estate's misrepresentations. This procedural abuse ensured that

the estate retained the improperly allocated funds at the expense of the token holders.

6. **Incentive for Misrepresentation**: Trustee's counsel Egan was incentivized by a 30% contingency fee, amounting to $900,000 of the $3 million settlement. This financial motive drove the deliberate misrepresentation of facts to the court.

**Key Evidence Supporting Fraud on the Court**

- **Conflicting Statements:**

The Trustee initially acknowledged that the token holders had independent claims but later portrayed these claims as derivative of the estate to justify sanctions and injunctions.

- **Selective Disclosure:**

The Trustee and Egan provided only partial financial records and communications, creating a misleading narrative in favor of the estate.

- **Misuse of the Automatic Stay:**

The Trustee and Egan's improper request for sanctions against token holders for allegedly violating the automatic stay reflects a misuse of bankruptcy protections to block valid litigation efforts.

- **Misallocation of Funds to Third Parties:**

The Trustee and Egan's Verified Complaint reveals that funds were funneled to

unrelated creditors, such as **Singtrade KR Pte Ltd.,** without transparency, further concealing the misuse of escrow funds.

**Relief Sought**

1. **Vacate the $3 Million Settlement:**

    The plaintiff requests that the court **vacate the settlement** between the bankruptcy estate and Perkins Coie due to the Trustee's fraudulent misrepresentations, which secured the settlement under false pretenses.

2. **Compensatory and Punitive Damages:**

    a. **Compensatory Damages:** To compensate for the financial harm caused by the Trustee and Egan's fraudulent conduct, the plaintiff seeks damages in an amount to be determined at trial.

    b. **Punitive Damages:** The plaintiff further requests punitive damages to deter future misconduct and penalize the Trustee and Egan's deliberate deception.

3. **Injunction Against Future Misrepresentations:**

    The plaintiff asks the court to issue an **injunction prohibiting the Trustee** from making further misrepresentations about the estate's standing or ownership of the escrow funds, ensuring the integrity of future proceedings.

4. **Full Accounting of Escrow Fund Use:**

The plaintiff seeks a **complete accounting** of how the escrow funds were used, to uncover any wrongful transfers or misallocations to third parties.

**Fraud on the Court Conclusion**

This case involves **intentional misrepresentations, selective disclosure of facts, and procedural abuse** by the Trustee and Egan to secure a wrongful benefit for the bankruptcy estate. The court's reliance on these misrepresentations resulted in an **unjust allocation of funds** that deprived the token holders of their rightful recovery. To address this **fraud on the court**, the plaintiff requests that the court:

- **Vacate the $3 million settlement**
- **Award compensatory and punitive damages**
- **Impose a constructive trust** over the misallocated funds

The plaintiff further requests full disclosure and accountability to ensure that **justice is served** and the token holders' rights are upheld. The integrity of the judicial process must be restored by correcting the errors and preventing the estate from retaining funds to which it has no legal claim.

---

**Jurisdictional And Procedural Challenges**

**Stern v. Marshall Argument:**

This case involves **non-core bankruptcy matters**, specifically state-law claims for **unjust enrichment, constructive trust, and fraud on the court**—claims that are independent of the bankruptcy process. These claims arise from the wrongful release and misallocation of escrow funds, which do not involve the restructuring of debtor-creditor relationships. In ***Stern v. Marshall, 564 U.S. 462 (2011)***, the U.S. Supreme Court held that bankruptcy courts lack the constitutional authority to issue final judgments on state-law claims unrelated to the core bankruptcy process. Here, the Plaintiff's claims involve private rights stemming from the escrow agreement, which predate the bankruptcy, and thus lie outside the bankruptcy court's jurisdiction. This reinforces that **this Court must exercise its Article III authority** to adjudicate these claims. Although the bankruptcy court approved the $3 million settlement, **the claims originate from the U.S. District Court's jurisdiction** over independent state-law causes of action. The **Trustee's improper application of the automatic stay** to these claims, folding them into the bankruptcy proceedings, **did not convert these state-law claims into core bankruptcy matters**. Therefore, these matters remain independent and must be adjudicated by this Court.

**Misapplication of the Automatic Stay**

The **bankruptcy court wrongly applied the automatic stay** to Counts I-III of the class-action group's claims, which are based on **contractual rights under the escrow agreement**. These claims are independent of the bankruptcy estate and should have been treated as such. Instead, the court **mischaracterized these claims as derivative** of the bankruptcy estate, thereby blocking the Plaintiff from pursuing its rightful claims in an impartial forum. Courts have **consistently held that independent state-law claims based on contractual rights**—like those presented here—**cannot be subjected to the automatic stay**. The Trustee's improper use of the automatic stay **wrongfully shielded the bankruptcy estate** from liability and allowed it to benefit from funds meant for the token holders, preventing the Plaintiff from obtaining appropriate relief.

**District Court as the Proper Venue**

**Likelihood of Judicial Bias and Finality of Prior Rulings:**

The bankruptcy judge has previously issued **rulings favoring the Trustee** and supporting the misapplication of the automatic stay. Given the **low likelihood that these rulings will be overturned**, the **U.S. District Court must assert jurisdiction** to ensure a fair adjudication. The bias evident in the bankruptcy proceedings compromises the Plaintiff's right to impartiality, making the District Court the only appropriate venue.

**Argument Against the Defendant's Bankruptcy Claim Defense:**

The **Defendants may argue that the $3 million settlement arose from bankruptcy proceedings** because the Trustee initiated a lawsuit against Perkins Coie before the class-action suit was filed in the District Court. However, this argument fails because **the basis of the settlement lies in the premature release of escrow funds**, not the administration of the bankruptcy estate. The **Trustee improperly invoked the automatic stay** to "steal" the causes of action belonging to the token holders. While the bankruptcy court approved the settlement, **the true origin of the claims lies in the District Court case**. These claims are **independent of bankruptcy proceedings** and concern the mismanagement of escrow funds—an issue that must be resolved by the District Court.

**Errors in Standing Analysis**

The bankruptcy court erroneously **granted standing to the estate for claims belonging to the token holders**. The **estate was unjustly enriched** by the $3 million settlement funds, which were intended to compensate the token holders for the premature release of escrow funds. **The estate suffered no harm** from the release, was not a party to the escrow agreement, and lacked any legal basis to receive the funds. This **misallocation of standing** further underscores the necessity

1  for the **District Court to review the claims** and provide equitable relief.

2  **Non-Consent to Bankruptcy Court Jurisdiction**

3  The Plaintiff explicitly **does not consent to bankruptcy court jurisdiction** over

4  these claims and invokes the right to adjudication in an **Article III court**. In

5  *Wellness Int'l Network, Ltd. v. Sharif*, the Supreme Court confirmed that without

6  explicit consent, **non-Article III courts lack authority** to issue final judgments on

7  state-law claims. As the Plaintiff has not given consent, the U.S. District Court

8  must assume jurisdiction.

9  **Judicial Bias and Procedural Concerns**

10 The bankruptcy judge has **demonstrated bias in favor of the Trustee**, advancing

11 **frivolous motions** that favored the estate and ignoring valid challenges regarding

12 **standing and unjust enrichment**. The **refusal to address these legitimate claims**

13 and threats of sanctions against the Plaintiff further erode the fairness of the

14 proceedings. Therefore, **the U.S. District Court must adjudicate these claims to**

15 **ensure impartiality and fairness**.

16 **Case Law Supporting Jurisdictional Arguments**

17 The **constitutional principles outlined in** *Stern v. Marshall*, *Northern Pipeline*

18 *Co. v. Marathon Pipe Line Co.*, **458 U.S. 50, 102 S. Ct. 2858 (1982)**, *Murray's*

19 *Lessee et al. v. Hoboken Land Improvement Co.*, **59 U.S. 272 (1855)** and *Wellness*

***Int'l Network, Ltd. v. Sharif*** confirm that **state-law claims outside of core bankruptcy matters must be resolved by Article III courts**. These cases affirm that claims rooted in private rights—such as those arising from the escrow mismanagement—**cannot be adjudicated by a bankruptcy court without consent**.

**Acknowledgment of Potential Collateral Attack Argument**

The Plaintiff acknowledges that the Defendants may raise an argument that this action constitutes a collateral attack on prior rulings in the bankruptcy proceedings. The Plaintiff respectfully asserts the following in response:

1. The funds at issue, though currently held by the bankruptcy estate, were wrongfully diverted from the Plaintiff and are not rightfully property of the estate. They were intended for the Plaintiff under a separate settlement agreement and were unjustly retained by the estate, resulting in unjust enrichment.

2. The claims brought in this action arise under state-law rights that are independent of the bankruptcy proceedings. These claims are distinct from the administration of the estate and do not pertain to the restructuring of debtor-creditor relationships.

3. Any challenges based on principles of finality or jurisdiction will be fully addressed at the appropriate stage of these proceedings, as necessary, to ensure a just resolution of the claims presented.

4. The Plaintiff reserves the right to provide further arguments and evidence on these issues as they arise during the course of litigation.

**Why The Automatic Stay Does Not Apply**

1. **Independent Rights**: The Plaintiff's claims arise from independent state-law rights under the escrow agreement, which predate the bankruptcy proceedings. These claims are not derivative of the bankruptcy estate's rights and do not concern the restructuring of debtor-creditor relationships.

2. **Non-Estate Claims**: The funds at issue are not property of the bankruptcy estate. They represent proceeds intended for token holders, as outlined in the escrow agreement and class-action settlement, which were wrongfully diverted to the estate through misrepresentation and procedural error.

3. **Pre-Bankruptcy Conduct**: The claims stem from the wrongful release and misallocation of escrow funds by Perkins Coie LLP, a breach of contract and fiduciary duty that occurred before Giga Watt's bankruptcy filing. The bankruptcy estate's involvement came only after the funds were improperly diverted.

4. **Legal Precedents**: Courts have consistently ruled that independent claims based on state law are not subject to the automatic stay under 11 U.S.C. § 362. See *Ahcom, Ltd. v. Smeding*, 623 F.3d 1248 (9th Cir. 2010) (holding that a bankruptcy estate cannot assert standing over a claim where no privity exists).

5. **Misapplication of the Stay**: The bankruptcy court erroneously applied the stay to block independent claims by token holders against Perkins Coie LLP. This misapplication facilitated the improper diversion of funds to the estate and shielded the Trustee from scrutiny.

6. **Remedial Action Required**: The Plaintiff seeks a determination from this Court that the automatic stay does not apply to these independent claims. Alternatively, Plaintiff seeks relief from the automatic stay under **11 U.S.C. § 362(d)**, as the continued application of the stay results in inequity and harm to non-debtor parties.

**Additional Procedural Considerations Reserve the Right to Amend**

The Plaintiff reserves the right to amend this Complaint in accordance with **Federal Rule of Civil Procedure 15(a)**, which permits amendments to pleadings with the Court's approval or as a matter of course under specific conditions. **Rule 15(a)** directs that such amendments should be "freely given when justice so requires."

The Plaintiff explicitly reserves the right to supplement, modify, or otherwise amend the claims, factual allegations, and legal arguments presented herein to incorporate:

- Additional evidence uncovered during the discovery process;
- New developments arising in the course of these proceedings; or
- Clarifications needed to address issues raised by the Defendants or the Court.

**Addendum Statement**

The Plaintiff is actively reviewing public bankruptcy and district court transcripts, filings, and related documents to further identify and substantiate the specific misrepresentations and omissions allegedly made by Defendant Egan. In accordance with **Federal Rule of Civil Procedure 15(d),** which permits the filing of supplemental pleadings to account for events occurring after the original pleading, the Plaintiff anticipates submitting an addendum to this Complaint. The addendum will include:

- Additional evidence substantiating the claims presented herein;
- Declarations authenticating relevant documents and records; and
- Any other facts or arguments necessary to ensure a full and fair adjudication of the issues raised in this action.

This approach ensures that all claims are properly substantiated and that the interests of justice are served.

**Demand for Jury Trial**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Plaintiff hereby demands a trial by jury on all issues triable by a jury in this action.

**Jurisdictional And Procedural Challenges Conclusion**

For the reasons outlined, the **U.S. District Court must assert jurisdiction** over the Plaintiff's claims for **unjust enrichment, constructive trust, and fraud on the court**. These are **non-core bankruptcy matters** that must be adjudicated by an **Article III court**. The **misapplication of the automatic stay**, **improper allocation of standing**, and **judicial bias** in the bankruptcy proceedings **necessitate that this case be initiated in the District Court** to ensure a fair resolution. The Plaintiff respectfully requests that this Court **vacate the improper settlement, restore the misallocated funds to their rightful owners, and provide the appropriate equitable remedies** to ensure justice for the **token holders**.

---

**Legal Challenges: Overcoming the Release Clause**

**1. Lack of Privity**

The Trustee and Giga Watt Inc. were not in privity with the class-action group of

token holders under the class-action settlement agreement. Privity, a foundational principle of contract law, is required for a party to enforce contractual obligations or benefits. Since neither the Trustee nor the Giga Watt bankruptcy estate was a party to the escrow agreement or the settlement, they lack any direct contractual relationship with the token holders. The release language in the settlement agreement, which was negotiated exclusively between Perkins Coie and the class-action group of token holders, was never intended to extend to the Trustee or the bankruptcy estate. As a result, any attempt by the Trustee or the Giga Watt estate to invoke the release clause fails due to the clear absence of privity. Courts have consistently held that release clauses can only bind parties who are in direct contractual privity, and in this instance, the Trustee and the estate were outsiders to the agreement.

**2. Lack of Consideration**

The enforceability of a release clause hinges on the presence of valid consideration—something of value exchanged between the parties. In this case, the Trustee and the Giga Watt estate provided no consideration in exchange for the release of claims. Without any reciprocal exchange of value, the release clause is legally deficient and unenforceable against the token holders. The bankruptcy estate's receipt of $3 million from Perkins Coie under the settlement does not

constitute valid consideration because the estate did not suffer any harm, nor did it provide any benefit or compensation in return for the release. Under contract law, consideration must be a bargained-for exchange, and the estate's mere receipt of funds does not meet this standard. Courts have routinely invalidated release clauses in the absence of consideration, as a party cannot enforce a release without providing something of value in return.

**3. Third-Party Beneficiary Rights**

Under contract law, only those parties who are intended beneficiaries of a contract may enforce its provisions. (See *GECCMC 2005-C1 Plummer Street Office Ltd. Partnership v. JPMorgan Chase Bank*, 671 F.3d 1027, 12 Cal. Daily Op. Serv. 1296, 2012 Daily Journal D.A.R. 1333 (9th Cir. 2012)) For a third party to claim rights under a contract, there must be a clear intent, at the time of execution, that the contract was created for their direct benefit. In this case, the settlement agreement between Perkins Coie and the token holders was not intended to confer any benefit on the Trustee or the Giga Watt estate. The agreement was designed to resolve claims related to the premature release of escrow funds, with the token holders as the primary intended beneficiaries. The Trustee and the estate, being neither parties to nor beneficiaries of the agreement, cannot claim rights under the release clause. The law is clear that incidental beneficiaries, those who might

indirectly benefit from an agreement, have no standing to enforce contractual provisions. Therefore, the Trustee and the estate lack the legal standing to argue that the token holders waived their claims through the release provision.

**Anticipating Potential Defenses**

The Trustee and Giga Watt may argue that they were indirectly benefited by the settlement or that the release clause should be interpreted broadly to cover their interests.  However, these defenses lack legal merit for the following reasons:

**1. Lack of Consideration for the Release Clause**

The $3 million received by the bankruptcy estate does not constitute valid consideration for the release of claims against the Trustee or the estate. Under fundamental contract law principles, consideration must flow to the party relinquishing its rights—in this case, the token holders.

- **No Direct Benefit to Token Holders:** The estate's receipt of $3 million provided no direct benefit to the token holders. On the contrary, it directly reduced the funds available to them from the escrow settlement, causing financial harm.

- **No Involvement in the $4.5 Million Settlement:** Even if the Trustee argues that the $4.5 million settlement constituted consideration, this argument fails. The $4.5 million settlement was negotiated directly between Perkins Coie and the token holders, without any involvement or contribution by the bankruptcy estate.

- **Consideration Must Flow From the Party Seeking Release:**

Consideration must flow from the party seeking the release. The estate's incidental receipt of $3 million does not satisfy this requirement, as it neither originated from nor directly benefited the token holders.

**2. Incidental Benefits Do Not Create Enforceable Rights**

The estate's receipt of $3 million was incidental and entirely unrelated to the terms of the $4.5 million settlement between Perkins Coie and the token holders. The $3 million settlement was not part of the consideration flowing to the token holders but was instead a misallocation of funds that diminished the amount available to the rightful beneficiaries under the escrow agreement.

**Legal Principle:**

As established in *Quine v. Beard*, Case No. 14-cv-02726-JST (N.D. Cal. Sep. 13, 2017), and *United States v. FMC Corp.*, 531 F.3d 813 (9th Cir. 2008), incidental benefits do not create enforceable rights under contract law. These cases emphasize that incidental benefits received by a party cannot serve as a substitute for valid consideration or confer contractual rights unless expressly intended by the agreement.

**Not Direct Parties or Beneficiaries:**

The Trustee and the bankruptcy estate were not direct parties to the settlement agreement between Perkins Coie and the token holders. Nor were they intended beneficiaries of the release clause.

**No Valid Consideration:**

Any benefits the Trustee or the estate incidentally received, such as the $3 million settlement to the estate, cannot be construed as consideration for the release or as creating enforceable rights under the settlement agreement.

**Token Holder Benefits Are Irrelevant:**

Even if the Trustee argues that the token holders incidentally benefited from the estate's receipt of funds, such incidental benefits cannot negate the misallocation of funds or justify the wrongful retention of the $3 million by the estate.

**3. Contradiction with Settlement Intent**

A broad interpretation of the release clause to shield the Trustee or the bankruptcy estate from claims would contradict the clear intent of the settlement.

**Exclusive Purpose:**

The settlement agreement was carefully negotiated and explicitly intended to resolve claims solely between Perkins Coie and the token holders. The agreement's language makes no mention of extending the release to include the Trustee or the bankruptcy estate, nor does it suggest that their involvement was contemplated as

1    part of the agreement.

2    **Judicial Precedent:**

3    Courts routinely reject attempts to broaden release clauses beyond the specific

4    parties and purposes explicitly identified in the agreement. See *Quine v. Beard* and

5    *FMC Corp.*, which affirm that incidental or tangential involvement in a settlement

6    does not entitle a party to enforce or benefit from its terms without express

7    inclusion.

8    **No Basis for Trustee's Argument:**

9    The Trustee's argument for implied consent or reliance on the release clause is

10   unsupported by the settlement's terms and is contradicted by its language and

11   intent.

12   **4. Conclusion: Defenses Should Be Rejected**

13   The Trustee and the bankruptcy estate cannot rely on the release clause to shield

14   themselves from the token holders' claims.

15   **Misallocation of Funds:** The $3 million received by the estate was not

16   consideration flowing to the token holders, nor did it provide them with any direct

17   benefit. Instead, the funds represent a misallocation of escrow funds that caused

18   direct financial harm to the token holders.

19   **No Enforceable Rights:** Any argument for implied consent or reliance on

incidental benefits as a basis for enforceable rights is unsupported by law and contradicted by the language and intent of the settlement agreement.

**No Justification for Retention:** The incidental receipt of funds by the estate cannot serve as valid consideration for a release or confer enforceable rights under the agreement.

The Trustee and the Giga Watt estate have no enforceable rights under the settlement agreement, and their defenses relying on incidental benefits or implied consent should be rejected in full.

**Legal Challenges Conclusion**

The release clause in the settlement agreement between Perkins Coie and the token holders is unenforceable against the Trustee and the Giga Watt bankruptcy estate due to the lack of privity, consideration, and third-party beneficiary rights. The Trustee and the estate were not parties to the agreement, did not provide any valid consideration to support the release of claims, and were not intended beneficiaries of the settlement. As a result, the token holders' claims for unjust enrichment, constructive trust, and fraud on the court remain valid and enforceable against the bankruptcy estate. The court should reject any arguments by the Trustee or the estate that attempt to invoke the release clause, as they lack both the legal standing and the contractual basis to do so.

1

2    **Relief Sought and Conclusion**

3    The bankruptcy estate's receipt of the $3 million settlement from Perkins Coie was

4    unjust and achieved through fraudulent misrepresentations by the Trustee and

5    Defendant Egan to the bankruptcy court. These funds, intended for the token

6    holders under the escrow agreement, were wrongfully diverted to the estate through

7    misrepresentations of standing, selective disclosure of material facts, and misuse of

8    legal procedures. This action seeks to correct the misallocation of settlement funds,

9    hold the responsible parties accountable, and prevent further unjust enrichment by

10   the bankruptcy estate.

11   The Plaintiff respectfully requests that the Court grant the following relief:

12   **Procedural Safeguards**

13      • **Preliminary Injunction:**

14   Issue a preliminary injunction to prevent the further disbursement or use of the $3

15   million settlement funds while this litigation is pending, ensuring that the funds

16   remain intact and traceable.

17      • **Relief from Automatic Stay:**

18   Grant relief from the automatic stay under 11 U.S.C. § 362(d) to allow this Court to

19   adjudicate the Plaintiff's state-law claims and determine the proper allocation of

the $3 million settlement funds. The Plaintiff's claims are based on independent state-law rights that predate the bankruptcy filing and are not derivative of the estate's interests. Relief from the stay is necessary to prevent further harm to the Plaintiff and other token holders and to ensure the proper adjudication of these claims.

**Substantive Relief**

- **Disgorgement of Settlement Funds:** Disgorge the $3 million settlement funds and place them into a constructive trust for the benefit of the token holders to ensure their rightful allocation.

- **Vacate the Fraudulent Settlement:** Vacate the $3 million settlement and declare it void due to the fraudulent misrepresentations and omissions that formed its basis.

- **Award Individual Compensatory Damages:** Award the Plaintiff $300,000 in compensatory damages for the financial harm suffered due to the wrongful allocation of the escrow funds.

- **Class-Wide Relief (Anticipated):** Acknowledge the Plaintiff's intent to seek reconstitution of the class action to pursue the full $3 million in damages on behalf of all token holders once the class is reestablished.

- **Award Punitive Damages:** Award punitive damages to deter future fraudulent conduct and uphold the integrity of the judicial process.

**Accountability Measures**

- **Sanctions Against Defendant Egan:** Impose sanctions on Defendant Egan for intentional misconduct and misuse of the judicial process.

- **Award Attorneys' Fees and Costs:** Award attorneys' fees and costs incurred in bringing this action, as the Trustee and Defendant Egan's egregious misconduct necessitated this litigation to correct the fraudulent misallocation of funds and protect the rights of the token holders.

**Additional Equitable Relief**

- **Grant Additional Relief:** Grant any additional equitable relief the Court deems necessary to restore the token holders to the position they would have been in but for the wrongful allocation of funds.

The requested relief will ensure that justice is served, accountability is enforced, and the escrow funds are returned to their intended beneficiaries. This case underscores the urgent need to correct fraudulent conduct in judicial proceedings, prevent further harm to the token holders, and restore the integrity of the legal process.

To further support the claims made herein, Plaintiff has submitted a Declaration and attached supporting evidence as exhibits, detailed in the appended documents.

Dated this 10th day of December, 2024

Jun Dam (*Pro Se*)
5432 Geary Blvd #535
San Francisco, CA 94121
Phone: (415) 748-1113
Email: jundam@hotmail.com